# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

BRIAN DANIEL ALBERTS,

     Plaintiff,

   v.

CAROLYN W. COLVIN, Acting
Commissioner of the Social
Security Administration,

     Defendant.

Case No. EDCV 15-0947 SS

**MEMORANDUM DECISION AND ORDER**

## I.

## INTRODUCTION

  Brian Daniel Alberts ("Plaintiff") seeks review of the decision of the Commissioner of the Social Security Administration ("Commissioner" or "Agency") denying his application for Disability Insurance benefits and for Supplemental Security Income benefits. The parties consented, pursuant to 28 U.S.C. § 636(c), to the jurisdiction of the undersigned United States Magistrate Judge. For the reasons stated below, the Court AFFIRMS the Commissioner's decision.

## II.

### PROCEDURAL HISTORY

On March 2, 2010, Plaintiff filed an application for Disability Insurance Benefits (DIB) and for Supplemental Security Income ("SSI"). (Administrative Record ("AR") 17, 53-54, 193-96, 352, 686-87, 739-40). Plaintiff alleged that he became unable to work as of January 1, 2004, and November 27, 2009, due to various conditions including abdominal hernia, fractured knee, attention deficit hyperactivity disorder, dyslexia, and a learning disability. (AR 43, 193, 215, 219, 249).[1] The Agency denied the application on October 17, 2011 (AR 17; see also AR 55, 53) and on reconsideration on March 12, 2012. (AR 17; see also 54, 62). On March 31, 2012, Plaintiff requested a hearing. (AR 64). The administrative law judge ("ALJ") conducted hearings on December 13, 2012, August 9, 2013, and December 11, 2013.[2] (AR 658-771; id. at 739-40). On January 17, 2014, the ALJ issued a decision denying

---

[1] Plaintiff has previously alleged that he suffers from a cognitive impairment due to his learning disability but that this mental impairment did not impede his ability to engage in physical labor. (AR 742-44). Plaintiff later testified, however, that sometime before December 31, 2008, he became physically impaired due to his hernia and therefore unable to work. (AR 17, 743-44, 765). Plaintiff appears to seek benefits only for the closed period during which he both was physically impaired due to his hernia and cognitively impaired due to his learning disability. (AR 742-44; AR 699-700; 770-71; Pl's Reply; Mem. of Points and Auths. ("Pl's Reply") at 5-6). None of the arguments asserted in Plaintiff's brief contest the ALJ's findings regarding Plaintiff's physical impairment.

[2] ALJ Jennifer A. Simmons continued the hearing from October 30, 2012 to December 13, 2012 (AR 658), at Plaintiff's request, to give him additional time to gather records. (AR 651, 656). ALJ James P. Nguyen subsequently conducted a hearing on August 9, 2013 and on December 11, 2013. (AR 698, 739-40).

benefits.  (AR 14-28).  Plaintiff sought review before the Appeals
Council, which the Council denied on March 20, 2015.  (AR 9-13).
The ALJ's determination then became the Commissioner's final
decision.  (AR 9).  Plaintiff filed the instant action on May 13,
2015.  (Dkt. No. 1).

## III.

### FACTUAL BACKGROUND

Plaintiff was born on April 21, 1978.  (AR 43, 701).  On
January 1, 2004, the alleged date of disability onset, Plaintiff
was twenty-five years old.  (AR 19; see also 43, 193, 215).
Plaintiff attended special education classes since 1982 and
completed high school through the tenth or eleventh grade.
Plaintiff received Ds and Fs and completed only 45 of 75 attempted
high school credits.  (AR 343-47, 749, 699, 283, 255).
Subsequently, in 2012, Plaintiff received a "diploma" from a
"Christian school" upon completing a four-week program and passing
a test with third-party assistance.  (AR 749-54).

At the time of the hearing, Plaintiff lived with his family.
(AR 23).  Plaintiff's past work from August 2000 through 2003
includes bonding circuit boards to pallets at a photography
laboratory; unloading and stocking wood at a warehouse; loading
and unloading furniture at a warehouse; and detailing automobiles
and boats.  (AR 263-66, 250, 705).  From July 2012 through mid-
2013, Plaintiff worked in "erosion control", laying sandbags and
clearing sewers, drains, and weeds.  (AR 19, 662, 689-90, 745).

1    Prior to obtaining erosion control work in 2012, Plaintiff
2    was incarcerated from late October 2011 through June 2012 for petty
3    theft.  (AR 685; AR 669-70).  Plaintiff testified that he previously
4    suffered a conviction for grand theft auto.  (AR 670-671).  The
5    record reflects that Plaintiff reported three arrests, two charges
6    of grand theft auto and a past violation of parole.  (AR 438).
7    Plaintiff was released from custody in 2009 (AR 438) and then
8    returned to custody in 2011.  (AR 578).

9
10    Plaintiff reported a history of marijuana and amphetamines
11    use.  (AR 438).  He further reported using these drugs from ages
12    16 to 29.  (Id.).

13
14    **A.    Plaintiff's Relevant Mental Health History**

15
16    On May 20, 2010 and September 6, 2011, consultative examining
17    clinical psychologists Kim Goldman and Gabriela Gamboa examined
18    Plaintiff.  On May 20, 2010, Dr. Goldman interviewed Plaintiff and
19    administered the Wechsler Adult Intelligence Scale ("WAIS") Third
20    Edition battery of tests.  (AR 437-40).  Dr. Goldman reported that
21    Plaintiff "appeared to be an unreliable historian."  (AR 437).
22    While Plaintiff informed Dr. Goldman that he had held only one job
23    doing labor work for two years that ended when he was laid off in
24    2005, he reported on an Agency form that he had a history of working
25    as a detailer, in a warehouse, and in a photography laboratory.
26    (AR 263-67, 437).  Dr. Goldman conducted a mental status
27    examination, but noted that Plaintiff "did not make an adequate
28    effort on the tasks presented to him."  (AR 438).  Dr. Goldman

"[d]eferred" an assessment of Plaintiff's fund of information due to Plaintiff's "poor effort." (AR 438).

Plaintiff discussed his criminal history and substance abuse issues with Dr. Goldman. (AR 438). Plaintiff told Dr. Goldman he had been married once and divorced in 2005. (AR 437). Plaintiff has four children, from two partners. (AR 437). He also discussed his daily activities. Dr. Goldman reported that Plaintiff drives a car, has a valid driver's license, pays bills, visits his girlfriend's house, keeps track of money without assistance, and showers, bathes, grooms, and dresses himself without assistance. (AR 438).

Dr. Goldman administered the WAIS-III battery of cognitive tests. (AR 439). Dr. Goldman concluded that Plaintiff's IQ scores of 65 (verbal), 64 (performance), and 62 (full scale) were "not valid" because Plaintiff "made a volitional effort to present himself as impaired." (AR 439). Dr. Goldman diagnosed Plaintiff with malingering, amphetamine dependence in full sustained remission per self-report, and a personality disorder with antisocial features. (AR 440). Dr. Goldman noted that Plaintiff's "functional limitations were unable to be accurately assessed due to malingering." (AR 440).

Dr. Gamboa examined Plaintiff on September 6, 2011. (AR 518-22). Dr. Gamboa noted that Dr. Goldman diagnosed Plaintiff with malingering and was unable to assess Plaintiff accurately due to his malingering. (AR 519). Plaintiff reported to Dr. Gamboa that

Plaintiff had worked for "Eliminator Boats" for six years. (AR 519). Dr. Gamboa noted that Plaintiff could take care of his personal hygiene, shop, cook meals, do chores, drive, and take public transportation. (AR 520). Dr. Gamboa opined that Plaintiff had a borderline range for memory; a low-average to borderline range for attention and concentration, insight, and judgment; and a borderline to extremely low fund of knowledge. (AR 520-21).

Dr. Gamboa administered the WAIS-IV battery of cognitive tests. (AR 521). Dr. Gamboa reported that Plaintiff had a full scale IQ score of 62, a working memory score of 58, a perceptual reasoning score of 69, a processing speed of 71, and a verbal comprehension score of 72. (AR 521). Dr. Gamboa opined that the results "appear[ed] to be generally a valid estimate of the claimant's functional level at this time." (AR 521). Dr. Gamboa opined that "[g]iven the test results and clinical data, the claimant's overall cognitive ability fell in the borderline to the extremely low range of functioning." (AR 521). The psychologist diagnosed Plaintiff with a learning disorder, not otherwise specified, and bipolar disorder. (AR 521-22).

Dr. Gamboa opined that Plaintiff's overall cognitive ability fell in the borderline to the extremely low range of functioning; he was mildly limited in his ability to understand, remember, and carry out short and simplistic instructions; he was moderately limited in his ability to understand, remember, and carry out detailed instructions and make simplistic work-related decisions without special supervision; and he would be mildly to moderately

1  limited in his ability to interact with supervisors and coworkers.
2  (AR 522).

3

4  **B.    <u>Vocational Expert's Relevant Testimony</u>**

5

6       At the hearing on August 9, 2013, vocational expert ("VE")
7  David A. Rinehart testified that Plaintiff's past work included
8  bonding circuit boards to pallets at a photography laboratory.  The
9  VE opined that the work was best characterized as circuit board
10  bonder or encapsulator.  The VE opined that Plaintiff's other past
11  relevant work of unloading and stocking wood at a warehouse and
12  loading and unloading furniture at a warehouse was best categorized
13  respectively as material handler and warehouse laborer.  (AR 726).
14  The VE testified that the job of circuit board bonder is light and
15  unskilled and requires a specific vocational preparation ("SVP")
16  of 2.  (AR 726).  The job of material handler is heavy and semi-
17  skilled and requires an SVP of 3.  (AR 726).  The job of warehouse
18  laborer is medium and unskilled and requires an SVP of 2.  (AR
19  726).

20

21       The ALJ asked the VE to consider a hypothetical individual of
22  Plaintiff's age, education, and work experience who had the
23  residual functional capacity (RFC) that the ALJ ultimately
24  assessed.  (AR 726-27).  The ALJ inquired whether, with these
25  limitations, there would be other occupations available, and the
26  VE testified that such an individual could work as an addresser,
27  lens inserter, or preparer.  (AR 727).  The VE testified that the
28  job of addresser is sedentary, unskilled, and requires an SVP of

2; the job of lens inserter is sedentary, unskilled, and requires an SVP of 2; the job of preparer is sedentary, unskilled, and requires an SVP of 2. (AR 727). The ALJ asked whether the VE's testimony was consistent with the Dictionary of Occupational Titles ("DOT"), and the VE answered that his testimony was consistent. (AR 735; <u>see also</u> AR 725).

Plaintiff's attorney then inquired whether, if an inability to read was included in the ALJ's hypothetical, the VE's opinion would change. (AR 728). The VE testified that it would not. (AR 728). Plaintiff's counsel did not challenge the VE's conclusion that his testimony was consistent with the DOT.

## C.   **Plaintiff's Relevant Testimony**

Plaintiff testified that he attended special education classes "all his life." (AR 703; AR 675; <u>see also</u> 283, 255, 246). Plaintiff stopped attending high school after completing the tenth or eleventh grade. (AR 749; AR 712). Plaintiff testified that he dropped out of high school because he "had a kid at a young age." (AR 708). He "pretty much had to get to work because . . . – you know, I had to find work." (AR 708).

Plaintiff obtained a "diploma" from a Christian school after completing a four-week program. (AR 749). Plaintiff required the assistance of his mother and girlfriend to complete the assignments and the school was "okay with the help." (AR 749, 751). Plaintiff offered conflicting testimony whether the diploma was equivalent

to a high school diploma.  (AR 750 (testifying in response to the question whether it was a high school diploma, "Yes, I believe so. No, no, . . . it wouldn't be a high school diploma.  It, it was just a diploma")).

Plaintiff testified that he "can't read.  [He] can't write. [He] can't spell."  (AR 676; see also id. at 708 ("I'm dyslexic, I, I can't read or write[.]").  Plaintiff also testified that he cannot "really" read or that he can "barely" read. (AR 676; id. at 712).  In an adult disability report, Plaintiff represented that he cannot read above a "second grade" level.  (AR 249; compare AR 229-36, 281 (adult function reports asserting that he cannot read or write)).  However, Plaintiff also testified that his girlfriend "tries to help me out on my reading like . . . - you know, read something you're interested in."  (AR 712).

Plaintiff acknowledged that he obtained a valid driver's license but it was revoked in 2012.  (AR 703) (admitting without explanation that his license was revoked)).  Plaintiff reported that he can do basic math.  (AR 676).

Plaintiff testified that he was incarcerated for petty theft for stealing beer from Rite Aid in late October 2011 and that he was released in June 2012.  (AR 685; AR 669-70).  Plaintiff also was convicted of grand theft automobile for taking his girlfriend's vehicle without her consent.  (AR 670-71).  Plaintiff admitted that he has a history of methamphetamine abuse.  (AR 672).  He last used

methamphetamine one and one-half to two years before his December 2012 hearing.  (AR 672).

In July 2012, Plaintiff obtained employment in erosion control.  (AR 662, 689-90).  Plaintiff applied for this job in person and his girlfriend filled out the application.  (AR 769-70).  Plaintiff initially stated that he was "laid off" in approximately four months prior to the December 2013 hearing.  (AR 703, 745).  Plaintiff subsequently testified that he stopped working because "you know, there was a point was to even go – you know, my paychecks were only like – with child support and everything, my paychecks were only like, like $160 to $150 a week. . . .  I, I, I – child support, I have, I have to live, you know."  (AR 755).  At that time, he "had [his] own place," he was "doing good," and his girlfriend had a really good job.  (AR 755).  Plaintiff testified, "I just wanted to get out of there and better myself."  (AR 755).  When the ALJ asked follow-up questions, Plaintiff stated that he was "pretty much laid off."  (AR 756).  He then stated, "I'd say like laid off.  Well, you know, like quit, you know."  (AR 756).  Then, when asked again if he quit, Plaintiff denied quitting and stated that "they just said, you know, it's pointless for you to come in.  I, I didn't get no paper – you know, pointless, you know, there's no work."  (AR 756).

D.   **Lay Witness Testimony**

Plaintiff's mother testified that, "since he was born, [Plaintiff has] had disabilities."  (AR 735).  She testified that

1   Plaintiff cannot read or write, and she must fill out paperwork
2   for Plaintiff and "do the reading for him." (AR 724, 735). To
3   the extent other witness testimony was offered, it mirrored
4   Plaintiff's or his mother's testimony.

6   **E.    Adult Function And Disability Reports**

8       In his adult function reports dated May 13, 2010, June 28,
9   2011, and February 14, 2012, Plaintiff reported that he lives with
10  his mother and father.  His daily activities include taking a
11  shower, watching television, talking on the telephone, and eating
12  meals. (AR 229, 276, 314).  Plaintiff can maintain his own personal
13  care, and he requires no reminders to take care of his personal
14  needs and grooming or to take medications. (AR 231, 277, 315-16).
15  Plaintiff prepares his own meals including frozen dinners in the
16  microwave as well as cereal and sandwiches. (AR 231, 278, 316).

18      Plaintiff acknowledged that he is capable of going out alone,
19  he drives or rides in a car when he goes out, and he spends time
20  sitting outside in the sun. (AR 232, 279, 317). Plaintiff admitted
21  he can count change. (AR 232, 279).  Plaintiff cannot use a
22  checkbook. (AR 232, 279, 317). Plaintiff admitted in one adult
23  function report that he can handle a savings account but denied
24  being able to do so in two subsequent reports. (AR 232, 279, 317).
25  In a third party function report dated May 17, 2010, Plaintiff's
26  grandmother reported that prior to the pain presumably caused by
27  his hernia, Plaintiff "did most everything" that he now no longer
28  can do. (AR 240, 286).

## IV.

### THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents her from engaging in substantial gainful activity and that is expected to result in death or to last for a continuous period of at least twelve months.  Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)).  The impairment must render the claimant incapable of performing the work she previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry:

> (1)  Is the claimant presently engaged in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.
> (2)  Is the claimant's impairment severe?  If not, the claimant is found not disabled.  If so, proceed to step three.
> (3)  Does the claimant's impairment meet or equal one of the specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, the claimant is found disabled.  If not, proceed to step four.
> (4)  Is the claimant capable of performing his past work?  If so, the claimant is found not disabled. If not, proceed to step five.
> (5)  Is the claimant able to do any other work?  If not, the claimant is found disabled.  If so, the claimant is found not disabled.

1   See 20 C.F.R. §§ 404.1520, 416.920; see also Bustamante v.

2   Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001) (citations

3   omitted).

4

5       In between steps three and four, the ALJ must determine the

6   claimant's residual functional capacity ("RFC"). 20 CFR

7   416.920(e). To determine the claimant's RFC, the ALJ must consider

8   all of the claimant's impairments, including impairments that are

9   not severe. 20 CFR § 416.1545(a)(2).

10

11      The claimant has the burden of proof at steps one through

12  four, and the Commissioner has the burden of proof at step five.

13  Bustamante, 262 F.3d at 953-54. "Additionally, the ALJ has an

14  affirmative duty to assist the claimant in developing the record

15  at every step of the inquiry." Id. at 954. If, at step four, the

16  claimant meets her burden of establishing an inability to perform

17  past work, the Commissioner must show that the claimant can perform

18  some other work that exists in "significant numbers" in the

19  national economy, taking into account the claimant's RFC, age,

20  education, and work experience. Tackett, 180 F.3d at 1098, 1100;

21  Reddick, 157 F.3d at 721; 20 C.F.R. §§ 404.1520(g)(1),

22  416.920(g)(1). The Commissioner may do so by the testimony of a

23  vocational expert or by reference to the Medical-Vocational

24  Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2

25  (commonly known as "the Grids"). Osenbrock v. Apfel, 240 F.3d

26  1157, 1162 (9th Cir. 2001). When a claimant has both exertional

27  (strength-related) and non-exertional limitations, the Grids are

28  inapplicable and the ALJ must take the testimony of a vocational

13

1  expert.  <u>Moore v. Apfel</u>, 216 F.3d 864, 869 (9th Cir. 2000) (citing

2  <u>Burkhart v. Bowen</u>, 856 F.2d 1335, 1340 (9th Cir. 1988)).

3

4                                **V.**

5                        **THE ALJ'S DECISION**

6

7       The ALJ employed the five-step sequential evaluation process

8  and concluded that Plaintiff was not disabled within the meaning

9  of the Social Security Act.  (AR 28).  At step one, the ALJ found

10 Plaintiff met the insured status requirements of the Act through

11 December 31, 2008, and Plaintiff had not engaged in substantial

12 gainful activity since January 1, 2004, his alleged onset date.

13 (AR 19).  At step two, the ALJ found that Plaintiff had the severe

14 impairments of multiple hernias, status post-surgical repair;

15 Baker's cyst in the left knee; and borderline intellectual

16 functioning.  (AR 19).  At step three, the ALJ found that Plaintiff

17 did not have an impairment or combination of impairments that met

18 or medically equaled one of the listed impairments in 20 C.F.R.

19 Part 404, Subpart Part P, Appendix 1 (20 C.F.R. §§

20 404.1520(d),404.1525, 404.1526, 416.920(d), 416.925-26).  (AR 20).

21 The ALJ then found that Plaintiff had the RFC to perform sedentary

22 work as defined in 20 C.F.R. §§ 404.1567(a), 416.967(a) with the

23 limitations of understanding, remembering, and carrying out simple

24 job instructions; performing no work that requires directing

25 others, abstract thought, or planning; maintaining attention and

26 concentration to perform simple, routine, and repetitive tasks;

27 and performing work in an environment with occasional changes to

28 work setting and occasional work-related decision making.  (AR 21).

1   At step four, the ALJ determined that Plaintiff could not perform

2   his past relevant work.  (AR 26).  At step five, considering

3   Plaintiff's age, education, work experience, and RFC, the ALJ found

4   that Plaintiff could perform jobs that existed in significant

5   numbers in the national economy.  (AR 27).  According to the VE,

6   Plaintiff was able perform the jobs of addresser, lens inserter,

7   and preparer. (AR 28).  Therefore, the ALJ concluded that Plaintiff

8   was not under a disability as defined by 20 C.F.R. §§ 404.1520(g)

9   and 416.920(g).  (AR 28).

10

11                              **VI.**

12                       **STANDARD OF REVIEW**

13

14       Under 42 U.S.C. § 405(g), a district court may review the

15   Commissioner's decision to deny benefits.  The court may set aside

16   the Commissioner's decision when the ALJ's findings are based on

17   legal error or are not supported by substantial evidence in the

18   record as a whole.  Aukland v. Massanari, 257 F.3d 1033, 1035 (9th

19   Cir. 2001) (citing Tackett, 180 F.3d at 1097); Smolen v. Chater,

20   80 F.3d 1273, 1279 (9th Cir. 1996).  "Substantial evidence is more

21   than a scintilla, but less than a preponderance."  Reddick, 157

22   F.3d at 720 (citation omitted).  It is "relevant evidence which a

23   reasonable person might accept as adequate to support a

24   conclusion."  (Id.) (citations omitted).  To determine whether

25   substantial evidence supports a finding, the court must "'consider

26   the record as a whole, weighing both evidence that supports and

27   evidence that detracts from the [Commissioner's] conclusion.'"

28   Aukland, 257 F.3d at 1035 (quoting Penny v. Sullivan, 2 F.3d 953,

1   956 (9th Cir. 1993)).   If the evidence can reasonably support

2   either affirming or reversing that conclusion, the court may not

3   substitute its judgment for that of the Commissioner.   <u>Reddick</u>,

4   157 F.3d at 720-21.

5

6                                   **VII.**

7                                 **DISCUSSION**

8

9        Plaintiff asserts two claims: (1) the ALJ failed at step three

10  to properly assess the severity of Plaintiff's cognitive impairment

11  when the ALJ invalidated the IQ scores and concluded that the

12  impairments did not meet or medically equal listing 12.05C,

13  (Plaintiff's Mem. In Supp. of Compl. ("Pl's Mem.") at 4-5); and

14  (2) the ALJ failed at step five to make a specific finding regarding

15  literacy and obtain a reasonable explanation from the VE for the

16  purported inconsistencies between the jobs identified and the DOT.

17  (<u>Id.</u> at 14-16).   For the reasons discussed below, the Court AFFIRMS

18  the ALJ's decision.

19

20  **A.   <u>The ALJ Did Not Err At Step Three When He Found That Plaintiff's</u>**

21      **<u>Impairments Do Not Meet Or Medically Equal A Listed Impairment</u>**

22

23       Plaintiff claims that the ALJ failed at step three to properly

24  assess the severity of his combined impairments.   (Pl's Mem. at 4-

25  5).   The Court disagrees.

26

27       At the third step of the five-step analysis, the ALJ must

28  determine whether the impairment or combination of impairments

                                    16

meets or equals an impairment in the Listing.  If so, the claimant is presumed disabled and benefits are awarded.  <u>Bowen v. Yuckert</u>, 482 U.S. 137, 141 (1987); <u>Lester v. Chater</u>, 81 F.3d 821, 828 (9th Cir. 1995) (as amended).  Plaintiff has the burden to show that his condition meets or equals an impairment set forth in the Listing.  <u>Tackett</u>, 180 F.3d at 1098.

To <u>meet</u> a listed impairment, Plaintiff must demonstrate that he meets each characteristic of a listed impairment relevant to his claim and must have every finding specified in the listing. <u>Id.</u>; <u>Moncada v. Chater</u>, 60 F.3d 521, 523 (9th Cir. 1995); 20 C.F.R. § 416.925(d).   To <u>equal</u> a listed impairment, Plaintiff must establish "symptoms, signs and laboratory findings 'at least equal in severity and duration' to the characteristics of a relevant listed impairment." <u>Tackett</u>, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1526(a)).  Relevant here is Listing 12.05C, which a claimant satisfies by showing "(1) subaverage intellectual functioning with deficits in adaptive functioning initially manifested before age 22; (2) a valid IQ score of 60 to 70; and (3) a physical or other mental impairment imposing an additional and significant work-related limitation." <u>Kennedy v. Colvin</u>, 738 F.3d 1172, 1173 (9th Cir. 2013) (citing 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05C).

**1.    Subaverage Intellectual Functioning With Deficits In Adaptive Functioning Initially Manifested Before Age 22**

Plaintiff asserts that, "[a]s to his mental impairment, it began long before the age of 22 as shown by his enrollment in

17

1   special education and inability to obtain a GED or read despite

2   his efforts." (Pl's Mem. at 12 (citing AR 401-03)). Deficits in

3   adaptive functioning may be shown circumstantially through evidence

4   of attendance in special education classes, dropping out of high

5   school, poor grades, and difficulties in reading, writing, or math.

6   Sorter v. Astrue, 389 F. App'x 620, 621 (9th Cir. 2010) (enrollment

7   in special education classes throughout school years showed that

8   low intellectual functioning manifested prior to age 22); Hernandez

9   v. Astrue, 380 F. App'x 699, 700 (9th Cir. 2010) (repeating the

10  fourth grade, receiving poor grades in school, and failing to

11  attend high school evidence of onset prior to the age of 22);

12  Esparza v. Colvin, No. 15-CV-00748-SKO 2016 WL 3906934 (E.D. Cal.

13  July 18, 2016) ("Deficits in adaptive functioning may also be shown

14  circumstantially through evidence of attendance in special

15  education classes, dropping out of high school prior to graduation,

16  difficulties in reading, writing, or math, and low skilled work

17  history.") (citations omitted); Gomez v. Astrue, 695 F. Supp. 2d

18  1049, 1058-59 (C.D. Cal. 2010) (same).

19

20      Plaintiff attended special education classes in school "all

21  his life." (AR 703; AR 675; see also 283, 255, 246). Plaintiff

22  received Ds and Fs in his classes. (AR 699). Plaintiff's mother

23  testified that, "since he was born, [Plaintiff has] had

24  disabilities." (AR 735). While the evidence in the record

25  regarding the extent of Plaintiff's ability to read and write is

26  conflicting, supra § III.C, the special education classes and poor

27  grades constitute substantial evidence to support a finding of

28  onset prior to the age of 22.

1        **2.    A Valid IQ Score Of 60 To 70**

2

3        The Commissioner is not required to accept a claimant's IQ

4    scores, and may reject scores that are inconsistent with the

5    record.  See, e.g., Thresher v. Astrue, 283 F. App'x 473, 475 (9th

6    Cir. 2008); Brooks v. Barnhart, 167 F. App'x 598, 600 (9th Cir.

7    2006); Oviatt v. Comm'r of Soc. Sec. Admin., 303 F. App'x 519, 523

8    (9th Cir. 2008); Clark v. Apfel, 141 F.3d 1253, 1255 (8th Cir.

9    1998).  The Ninth Circuit, however, has not specifically decided

10   what information an ALJ may rely upon in determining the validity

11   of an IQ test result.  Wedge v. Astrue, 624 F. Supp. 2d 1127, 1131

12   (C.D. Cal. 2008) (citations omitted).  In Thresher v. Astrue, the

13   Ninth Circuit included the following footnote:

14

15           We have never decided what information is
             appropriately looked to in deciding validity.
16           Some courts have said that the score can be
             questioned on the basis of "other evidence,"
17           but have not discussed exactly how other
             evidence impacts the validity of the score
18           itself.  Clark v. Apfel, 141 F.3d 1253, 1255-
             56 (8th Cir. 1998); Popp v. Heckler, 779 F.2d
19           1497, 1499-1500 (11th Cir. 1986) (per curiam).
             Other courts have been more explicit and have
20           indicated that in questioning a score the ALJ
             must find some empirical link between the
21           evidence and the score.  Brown v. Sec'y of
             Health & Human Servs., 948 F.2d 268, 270 (6th
22           Cir. 1991); see also Markle v. Barnhart, 324
             F.3d 182, 187 (3d Cir. 2003) (activities of
23           claimant were not inconsistent with scores);
             Muse v. Sullivan, 925 F.2d 785, 789-90 (5th
24           Cir. 1991) (per curiam) (test conditions
             suggested invalidity).
25

26

27   Thresher, 283 F. App'x at 475 n.6.  The Ninth Circuit also has

28   found that a claimant's lack of effort on an IQ test, exaggeration

                                    19

of symptoms, and inconsistent educational, occupational, and functional limitations constitute valid bases to support invalidation of IQ scores. Brooks, 167 F. App'x at 600 (rejecting full scale score of 65 "because [the] testing was invalid and because the claimant's 'cognitions were not grossly impaired' at the clinical interview"; explaining the "scores [were] not consistent with the claimant's educational, occupational and functional limitations" of graduating from technical school with a B average, working for 17 years as a psychiatric technician, and attending vocational school to be a medical technician with an A average); Oviatt, 303 F. App'x at 523 (ALJ's invalidation of IQ results due to lack of effort and symptom exaggeration supported by substantial evidence where claimant had a "history of exaggeration" and there was "evidence that [claimant] had actually lowered her IQ scores due to a lack of effort").

The Ninth Circuit recently confirmed that IQ testing plays "a particularly important role in assessing the existence of intellectual disability." Garcia v. Comm'r of Social Security, 768 F.3d 925, 931 (9th Cir. 2014). The Garcia court explained that because meeting the listing conclusively determines that a claimant is disabled, his or her IQ score can be an important part of the intellectual disability determination. Id.

Courts outside the Ninth Circuit permit an ALJ to consider multiple factors in assessing the validity of IQ test results. See, e.g., Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992)

(a valid IQ is not conclusive when the score is inconsistent with other evidence in the record and claimant's daily activities); Popp, 779 F.2d at 1499-1500 (an invalid Minnesota Multiphasic Personality Inventory ("MMPI") score in conjunction with substantial evidence can discredit a qualifying IQ score); Clay v. Barnhart, 417 F.3d 922, 929 (8th Cir. 2005) (the ALJ is free to disregard a low IQ score where the evidence showed substantial malingering and daily activities inconsistent with the level of impairment alleged); Soto v. Secretary, 795 F.2d 219, 222 (1st Cir. 1986) (the ALJ need not accept the IQ score if there is a substantial basis for believing that plaintiff is feigning results); see also Wedge v. Astrue, 624 F. Supp. 2d 1127, 1131 (C.D. Cal. 2008).

Here, the ALJ provided persuasive and legitimate reasons, such as evidence of malingering, for rejecting Plaintiff's IQ scores. The ALJ reasoned as follows:

> In terms of the requirements in paragraph C, they are not met because the claimant does not have a valid verbal, performance, or full scale IQ score of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function (Ex. 3F). Again, the undersigned and Dr. Goldman finds the claimant's low IQ scores are not valid as explained in detail in Finding 5. While Dr. Gamboa's testing resulted in IQ scores within the requisite range, the undersigned finds these scores are not valid (Ex 12F/6). These scores do not reflect the claimant's true cognitive functioning based on the other evidence of his adaptive functioning, as will be discussed in Finding 5. Additionally, these scores are inconsistent with Dr. Gamboa's opinion of the claimant's mental capacity to perform work-related activities (Ex. 12/7).

(AR 20-21).  In finding five, the ALJ rejected Dr. Goldman's IQ scores as follows:

> Dr. Goldman diagnosed the claimant with malingering . . . . Dr. Goldman could not give a medical source opinion regarding the claimant's functional limitations because the claimant was malingering.  The undersigned finds the low IQ scores were not valid because [they are] inconsistent with the claimant's activities of daily living . . . and the medial records as a whole.  The claimant has described daily activities, which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. Further, Dr. Goldman indicated the claimant was malingering.

(AR 25).  The ALJ rejected Dr. Gamboa's IQ scores as follows:

> [T]he undersigned does not find the low IQ scores valid as [they are] inconsistent with the claimant's mental abilities when he could perform a variety of activities of daily living[.]  Further, the claimant testified under oath that he was attempting to enroll in a welding program, which most likely requires use of dangerous machinery and/or tools that would not be suitable for a person, who truly had a borderline or extremely low range of intellectual functioning[.]  Lastly, there is no indication that any validity testing was performed. There is nothing in examination report to suggest that the consultative examiner considered whether or not the claimant's subjective symptoms may have been motivated in whole or in party by secondary gain.  When a medical source uncritically accepts a patient's history, complaints, and subjective symptoms, the reliability of any resulting opinions and conclusions drawn by that medical soured must necessarily depend on the reliability of the claimant's self-reports.  Such opinions and conclusions, therefore, are subject to heightened scrutiny.  The undersigned has found in this case . . . that the allegations of the claimant are not fully credible.  Thus it follows that the medical source opinions and conclusions must be given less weight.

(AR 26).  The ALJ identified activities that were inconsistent with Plaintiff's IQ scores such as watching television; talking on the telephone; visiting his girlfriend; eating and preparing meals; doing chores; shopping; showering, bathing, dressing, and grooming; sitting in a chair outside; obtaining a valid driver's license and driving and riding in a car; going out and walking on his own; using public transportation; paying bills; keeping track of money without help from other people and counting change; and planning to enroll in a welding program.  (AR 23, 26).

Substantial evidence in the record supported the ALJ's invalidation of Plaintiff's IQ scores, such as: (1) Dr. Goldman's conclusion that Plaintiff's IQ scores were invalid and his finding that Plaintiff was malingering; (2) Plaintiff's daily activities that were inconsistent with extremely low IQ scores; (3) Dr. Gamboa's failure to conduct validity testing; and (4) the ALJ's finding that Plaintiff's statements were not fully credible and Dr. Gamboa's reliance on these statements for the IQ test and opinions.  The ALJ's reasons were specific, legitimate, and supported by substantial evidence.

Dr. Goldman found that her IQ test results were "not valid" because Plaintiff "made a volitional effort to present himself as impaired."  (AR 439).  She reported that Plaintiff was "an unreliable historian."  (AR 437).  Plaintiff informed Dr. Goldman that he had held only one job for two years but admitted to holding at least three jobs on a written form.  (AR 437).  Dr. Goldman concluded that Plaintiff "did not make an adequate effort on the

tasks presented to him." (AR 438). She could not adequately assess his fund of information "due to poor effort." (AR 438). She also could not assess his functional limitations due to his malingering. (AR 440). Dr. Goldman's diagnosis included malingering. (AR 440).

An ALJ is required to examine IQ test results in conjunction with the medical record and clinical findings. See 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00B4 ("The degree of impairment [for purposes of assessing mental retardation] should be determined primarily on the basis of intelligence level and a medical report."); Soto, 795 F.2d at 222 (in evaluating a claim of mental retardation, the Secretary is entitled to consider . . . clinical findings.") (citing 20 C.F.R. § 12.04B4); Popp, 779 F.2d at 1500 ("The ALJ is required to examine the [IQ test] results in conjunction with other medical evidence."). An expert's finding of the invalidity of IQ test scores casts doubt on the validity of test results and can serve as substantial evidence to invalidate scores for purposes of Listing 12.05C. Clay v. Barnhart, 417 F.3d 922, 930 (8th Cir. 2005) (consultative examining psychologist's conclusion that his test scores were invalid and that IQ results of a prior examining psychologist were invalid casts doubt on validity of IQ test results); Lax v. Astrue, 489 F.3d 1080, 1087 (10th Cir. 2007) (testing psychologist's comments explicitly questioning the claimant's effort on the test and ultimate validity of the IQ test results provided substantial evidence to support the ALJ's determination that the IQ scores were not reliable); see also Popp, 779 F.2d at 1500 (invalidity of the MMPI scores on the

ground that the claimant tended to place himself in an unfavorable light, even in the absence of any comment from the testing psychiatrist on the validity of IQ test results, served as evidence to invalidate WAIS-R IQ scores).

Moreover, a psychologist's opinion that a plaintiff is malingering or that he exaggerated the severity of his symptoms provides a legitimate basis for discounting or invalidating IQ test results. Oviatt, 303 F. App'x at 523 (IQ test results were "questionable" because of the claimant's lack of effort, influence of substance abuse and exaggeration of symptoms); Clay, 417 F.3d at 930 n.2 (a consultative examining psychologist's "general concerns about malingering, even if he only stated that malingering remained to be ruled out, and even if his concerns focused on physical impairments[,] cast suspicion on [the claimant's] motivations, her credibility, and the validity of [both that psychologist's and another psychologist's IQ] tests involving [the claimant]"); Popp, 779 F.2d at 1500 (psychiatrist's opinion that claimant exaggerated symptoms casts doubt on validity of IQ scores obtained by testing psychologist); Soto, 795 F.2d at 222 (on remand, "[the] Secretary is not obliged to accept results of claimant's IQ tests if there is a substantial basis for believing that claimant was feigning the results").

Here, Dr. Goldman found that Plaintiff made a volitional effort to present himself as impaired, did not exert adequate effort, gave inconsistent answers, and was malingering. Dr. Goldman's findings

of malingering and invalidity serve as reasonable bases for invalidating her test results.

Dr. Goldman's findings also support the invalidation of the IQ test results subsequently obtained by Dr. Gamboa. Dr. Gamboa opined that the WAIS-IV test results "appear[ed] to be generally a valid estimate of the claimant's functional level at this time." (AR 521). To reject uncontroverted findings of an examining physician, the ALJ must provide clear and convincing reasons. Carmickle v. Commissioner, 533 F.3d 1155, 1164 (9th Cir. 2008) (citing Lester, 81 F.3d at 830-31); compare Moua v. Colvin, 563 F. App'x 545, 546 (9th Cir. 2014) (to disregard the controverted opinion of an examining doctor in the context of determining whether a claimant meets Listing 12.05C, ALJ required to articulate specific and legitimate reasons supported by substantial evidence) (citing Lester, 81 F.3d at 830).

The ALJ relied on multiple grounds, which would satisfy either the clear and convincing or specific and legitimate standard, to support his finding that Plaintiff's IQ scores were not valid. The ALJ appropriately relied upon Dr. Goldman's finding that Plaintiff was malingering. Moreover, one mental health professional's opinion that a claimant is malingering or has a tendency to exaggerate may cast doubt not only on that professional's test results but also on the test results of another testing professional. See Clay, 417 F.3d at 930 n.2.

In addition, the ALJ properly rejected the validity of Dr. Gamboa's IQ scores because the results and assessment were based on statements by Plaintiff that the ALJ found to be not fully credible. (AR 26). Here, there was affirmative evidence to support the finding that Plaintiff was malingering, including Dr. Goldman's observations and Plaintiff's own conduct. Accordingly, the ALJ was entitled to reject Plaintiff's credibility. Benton ex rel. Benton v. Barnhart, 331 F.3d 1030, 1040 (9th Cir. 2003); Mohammad v. Colvin, 595 F. App'x 696, 697 (9th Cir. 2014) (citing Benton, 331 F.3d at 1040-41). The ALJ cited specific, clear and convincing reasons for discounting Plaintiff's credibility. Smolen, 80 F.3d at 1281.

The ALJ relied on Dr. Goldman's report that Plaintiff was a poor historian, exerted inadequate effort, made a volitional effort to present himself as impaired, and was malingering. (AR 20-21, 25). The ALJ indicated that Dr. Goldman diagnosed Plaintiff with malingering, found her test results to be invalid, and could not properly assess Plaintiff. (AR 20-21, 25). The ALJ also highlighted the inconsistencies in Plaintiff's statements. (AR 22 (plaintiff initially testified he was laid off but later acknowledged he stopped working because it was not worth it for him to do so)). In addition, the ALJ relied on Plaintiff's inconsistent activities and his conviction a crime of moral turpitude. (AR 23). These reasons were valid. See Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002) (claimant's failure to exert adequate effort is a basis for discounting his credibility); id. at 58-59 (inconsistencies in claimant's testimony serve as a

basis for discounting credibility); <u>Fair v. Bowen</u>, 885 F.2d 597, 604 n.5 (9th Cir. 1989) (same); <u>id.</u> at 603 (inconsistent daily activities a basis for discounting credibility); <u>Abidrez v. Astrue</u>, 504 F. Supp. 2d 814, 822 (C.D. Cal. 2007) (felony convictions for crimes involving moral turpitude a basis for discounting credibility); <u>see also</u> <u>Castillo-Cruz v. Holder</u>, 581 F.3d 1154, 1159 (9th Cir. 2009) (petty theft may constitute a crime of moral turpitude) (citations omitted).

Third, the ALJ reasonably rejected the validity of Dr. Gamboa's IQ scores because the psychologist failed to conduct validity testing. Dr. Gamboa acknowledged that Dr. Goldman found malingering and could not accurately assess Plaintiff. (AR 519). Dr. Gamboa nonetheless failed to conduct any validity testing or explain why the second set of IQ scores were valid.

Fourth, the ALJ properly rejected the validity of Dr. Gamboa's IQ scores (as well as Dr. Goldman's) because they were inconsistent with Plaintiff's activities of daily living and adaptive functioning.[3] In <u>Brooks v. Barnhart</u>, the Ninth Circuit rejected a full scale IQ score of 65 on the basis of the claimant's inconsistent educational, occupational, and functional limitations of graduating from technical school with a B average, working for 17 years as a psychiatric technician, and attending vocational

---

[3] <u>See</u> 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00B4 ("[c]are should be taken to ascertain that test results are consistent with daily required to examine the results [of an IQ test] in conjunction with . . . the claimant's daily activities and behavior"); <u>Soto</u>, 795 F.2d at 222 (Secretary entitled to consider "daily activities and behavior") (citing 20 C.F.R. § 12.04B4).

school to be a medical technician and obtaining an A average.  167 F. App'x at 600.  In Clark v. Apfel, an Eighth Circuit case cited in Thresher, the inconsistent functional abilities were reading, writing, and counting money; having a driver's license; doing the majority of the cooking, cleaning, and shopping for the household; and being the primary caretaker a young daughter.  141 F.3d at 1255-56.  In Popp v. Heckler, an Eleventh Circuit case cited in Thresher, the inconsistent activities included a college record of being close to completing a bachelor of science degree and a history of being a high school algebra teacher.  779 F.2d at 1499-1500. In Muse v. Sullivan, a Fifth Circuit case cited in Thresher, the inconsistent activities included the duties as a truck driver of reading delivery tickets, making deliveries to destinations specified on the tickets, and passing a written exam to obtain a chauffeur's license.  925 F.2d at 789-90.[4]

The ALJ concluded that Plaintiff's daily activities were inconsistent with his low IQ scores.  The ALJ's finding was reasonable.[5]  As in Clark, Plaintiff could count money and cook

---

[4] The Thresher court also cited two cases rejecting claims of inconsistent daily activities.  Brown, 948 F.2d at 270-71 (activities included using public transportation; obtaining a driver's license; visiting friends; making change; doing laundry; cleaning; completing sixth grade; limited reading comprehension (e.g., following a road atlas, reading a newspaper); completing duties truck driver including recording mileage, hours worked, and places driven); Markle, 324 F.3d at 183, 185, 187 (activities included attending special education classes; dropping out early in tenth grade; obtaining GED; reading, writing, adding, and subtracting; painting/wallpapering houses; cutting grass; living independently; going out; shopping, walking, and visiting friends; taking care of apartment; handling bills; and using an ATM).
[5] When the record evidence is "susceptible to more than one rational interpretation," the ALJ's decision should be upheld.  Bayliss v.

29

food, and he had his own driver's license.  Admittedly, other courts have found that being capable of making change, having a driver's license, using public transportation, going out alone, paying bills, and shopping were not inconsistent with low IQ scores.  <u>Supra</u> note 6.  Here, however, the ALJ also relied on Plaintiff's intent to enroll in a welding program.  The ALJ reasoned that the welding field required the use of dangerous machinery unsuitable for a person with a low intellectual functioning. <u>Compare</u> <u>Popp</u>, 779 F.2d at 1499-1500 (being a high school algebra teacher inconsistent with low IQ score).

Moreover, in the other cases where inconsistent activities were not enough to invalidate IQ scores, the claimants dropped out of school in the sixth and early tenth grades, <u>supra</u> note 6.  Here, Plaintiff dropped out in the tenth or eleventh grade because he had a child and needed to work.  (AR 708).  Finally, here Plaintiff's testimony is contradictory on the question whether he could read, <u>see</u> <u>supra</u> § III.C, the ALJ found Plaintiff's statements to be not fully credible for multiple valid reasons, <u>see</u> <u>supra</u> at 27-28, and Dr. Goldman opined that Plaintiff exerted poor effort, intentionally presented himself as impaired, and was malingering.[6]

---

<u>Barnhart</u>, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005).

[6] The ALJ also rejected the validity of Dr. Gamboa's IQ test results because the scores were inconsistent with Dr. Gamboa's opinion of Plaintiff's mental capacity to perform work-related activities. (AR 21).  The ALJ did not explain why the IQ test results were inconsistent with the other findings.  The inconsistency, therefore, cannot serve as substantial evidence to reject Dr. Gamboa's finding of validity.

1    ### 3.    A Physical Or Other Mental Impairment Imposing An
2         Additional And Significant Work-Related Limitation

3

4        Plaintiff's hernia satisfies the requirement in Listing 12.05C
5    of a physical impairment imposing an additional, significant work-
6    related limitation.   The Listing provides that the Agency "will
7    assess   the   degree   of   functional   limitation   the   additional
8    impairment(s) imposes to determine if it significantly limits your
9    physical or mental ability to do basic work activities, i.e., is a
10   'severe'   impairment(s),   as   defined   in   §§   404.1520(c)   and
11   416.920(c).    If   the   additional   impairment(s)   does   not   cause
12   limitations that are "severe" as defined in §§ 404.1520(c) and
13   416.920(c),   [the   Agency]   will   not   find   that   the   additional
14   impairment(s) imposes 'an additional and significant work-related
15   limitation of function.'"   20 C.F.R. pt. 404, subpt. P, app. 1, §
16   12.00A.  Here, the ALJ found Plaintiff's hernia to be severe within
17   the meaning of §§ 404.1520(c) and 416.920(c).   (AR 19).   Thus,
18   during the period when Plaintiff suffered from his hernia, he met
19   the additional physical impairment requirement in Listing 12.05C.

20

21   ### 4.    The   ALJ   Properly   Considered   Whether   Plaintiff   Was
22        Disabled Pursuant To Listing 12.05C

23

24        The   ALJ   properly   considered   whether   Plaintiff   was
25   intellectually  disabled  pursuant  to  Listing  12.05C.   The  ALJ
26   concluded that Plaintiff had not met the second requirement of a
27   valid IQ score of 60 to 70.   The ALJ discussed how the evidence
28   supported his conclusion that Plaintiff's IQ scores were not valid.

The ALJ's decision was reasonable and supported by substantial evidence.  Remand is not required.

**B.     The ALJ Did Not Err At Step Five By Declining To Explain Or Obtain An Explanation From The VE Of The Purported Inconsistency With The DOT**

Plaintiff contends that the ALJ erred at step five by failing to (1) make a specific literacy finding and (2) obtain a reasonable explanation from the vocational expert of how a hypothetical person who could not read or write nonetheless could perform work requiring level one or two reading.  (Pl's Mem. at 14-15).  The Court disagrees.

**1.     The ALJ Made A Specific Finding Regarding Plaintiff's Ability To Communicate**

At step five, "the burden shifts to the Commissioner to demonstrate that the claimant is not disabled and can engage in work that exists in significant numbers in the national economy." Hill v. Astrue, 698 F.3d 1153, 1161 (9th Cir. 2012); see also 20 C.F.R. §§ 404.1520(a)(1)(v), 416.920(a)(1)(v).  The DOT is the Commissioner's "primary source of reliable job information" and creates a rebuttal presumption as to a job classification.  Johnson v. Shalala, 60 F.3d 1428, 1434 n.6 (9th Cir. 1995); see also Tommasetti v. Astrue, 533 F.3d 1035, 1042 (9th Cir. 2008).

Plaintiff contends that the ALJ erred because he failed to make a specific finding regarding Plaintiff's literacy to support his deviation from the DOT. (Pl's Mem. at 14). This argument assumes that the ALJ found Plaintiff to be illiterate and that he relied on job descriptions in the DOT that conflicted with Plaintiff's purported limitation of illiteracy. Plaintiff cites Pinto v. Massanari, 249 F.3d 840 (9th Cir. 2001), to support his claim. In Pinto, the Ninth Circuit held that, "for an ALJ to rely on a job description in the [DOT] that fails to comport with a claimant's noted limitations, the ALJ must definitively explain this deviation" to allow courts to review the ALJ's decision. 249 F.3d at 847 (citation omitted).

In the present case, however, the ALJ had no obligation to make a specific finding regarding Plaintiff's purported illiteracy, as substantial evidence did not demonstrate that Plaintiff was, in fact, illiterate. The ALJ neither determined that Plaintiff was illiterate nor relied on job descriptions that were inconsistent with the noted limitations.

The ALJ determined that Plaintiff "has a limited education" but nonetheless was "able to communicate in English." (AR 27). The ALJ acknowledged that Plaintiff claimed to be unable to read or write. (AR 22). The ALJ found, however, that Plaintiff was not fully credible, (see AR at 27-28), and that Plaintiff could, in fact, communicate in English. (AR 27.). Moreover, the ALJ observed that Plaintiff had a driver's license and drives, uses public transportation, and pays bills, which are all activities

that require reading. (AR 23). The ALJ noted that Plaintiff
stated he was attempting to enroll in a welding program which the
ALJ found to be a program inconsistent with a low level of
intellectual functioning. (AR 26). Accordingly, the ALJ was not
required to conclude that Plaintiff was illiterate.

Substantial evidence supported this finding. Plaintiff
conceded in one report that he could read up to a second grade
level. (AR 249). He also testified that his girlfriend encouraged
him to read things that interested him. (AR 712). Plaintiff
testified that he planned to attend school in the future, which
would require reading ability ("Q: Have you tried to go back to
school? A: Oh, yes, I, I, I am. I am going to be attending RCC.").
(AR 708). Plaintiff's past relevant work required a reading level
of 1 or 2. DOT codes 7.26.687-022, 922.687-058, 929.687.030.
Plaintiff further equivocated regarding his purported inability to
read, stating that he could not read and that he could "barely" or
not "really" read. (AR 676, 712). Pinto thus is not applicable
here because the ALJ did not find Plaintiff to be illiterate and
there was no inconsistency with the DOT.

Pinto applies when an ALJ relies on a job description that is
inconsistent with the limitations demonstrated by the evidence.
Here, there was no such inconsistency. The ALJ relied on the VE's
job descriptions of addresser, lens inserter, and preparer (AR 28,
727), which require level 1 or 2 reading. See DOT codes 209.587-
101, 713.687-026, 700.687-062. The ALJ's reliance on these jobs
was not in conflict with the ALJ's statement of Plaintiff's

1    limitations.  The ALJ did not find that Plaintiff was illiterate.

2    (AR 27).   To reach his conclusion, the ALJ also relied on

3    Plaintiff's past work (AR 27), which was both unskilled and semi-

4    skilled and required an SVP of 2 or 3 (AR 726) and a reading level

5    of 1 or 2. DOT codes 7.26.687-022, 922.687-058, 929.687.030.

6

7        Because the ALJ neither found that Plaintiff was illiterate

8    nor relied on inconsistent DOT job descriptions, the ALJ had no

9    duty to make a specific finding regarding Plaintiff's language

10   abilities.  Cf. Pinto, 249 F.3d at 846-47.  No remand is required.

11

12       **2. The ALJ Satisfied His Duty To Inquire Into Inconsistencies**

13           **Between The VE's Testimony And The DOT**

14

15       Plaintiff argues that the ALJ erred by failing to obtain a

16   reasonable explanation from the VE of how a hypothetical person

17   who could not read or write nonetheless could perform jobs that

18   require level one or two reading.  (Pl's Mem. at 14-15).  Where,

19   as here, the testimony of a VE is used at step five, the VE must

20   identify a specific job or jobs in the national economy having

21   requirements that the claimant's physical and mental abilities and

22   vocational qualifications would satisfy.  See Osenbrock v. Apfel,

23   240 F.3d 1157, 1162-63 (9th Cir. 2001); Burkhart v. Bowen, 856 F.2d

24   1335, 1340 n.3 (9th Cir. 1988); 20 C.F.R. §§ 404.1566(b),

25   416.966(b).

26

27       An ALJ may not rely on a VE's testimony regarding particular

28   jobs without first inquiring of the VE whether his testimony

conflicts with the DOT and obtaining a reasonable explanation for any apparent conflict(s).  See Massachi v. Astrue, 486 F.3d 1149, 1152-53 (9th Cir. 2007) ("The procedural requirements of SSR 00-4p ensure that the record is clear as to why an ALJ relied on a vocational expert's testimony, particularly in cases where the expert's testimony conflicts with the Dictionary of Occupational Titles.") (citing SSR 00-4p).  An ALJ may rely on VE testimony that contradicts the DOT only insofar as the record contains persuasive evidence to support the deviation.  See Johnson, 60 F.3d at 1435; see also Tommasetti, 533 F.3d at 1042; Light v. Social Sec. Admin., 119 F.3d 789, 793 (9th Cir. 1997); see also Pinto, 249 F.3d at 847. When an ALJ fails to recognize an apparent conflict between limitations the ALJ assesses and requirements of a DOT job, the ALJ necessarily does not reconcile the inconsistency.  See Zavalin v. Colvin, 778 F.3d 842, 847 (9th Cir. 2015) ("In sum, because the ALJ failed to recognize an inconsistency, she did not ask the expert to explain why a person with Zavalin's limitation could nevertheless meet the demands of Level 3 Reasoning."); Rounds v. Comm'r of Soc. Sec. Admin., 807 F.3d 996, 1004 (9th Cir. 2015) ("Because the ALJ did not recognize the apparent conflict between [the claimant's] RFC and the demands of Level Two reasoning, the VE did not address whether the conflict could be resolved.").  A reviewing court, under these circumstances, cannot determine whether substantial evidence supports the ALJ's step five finding and remand is necessary.  See Rounds, 807 F.3d at 1004.  In the present case, however, there was no such inconsistency.

1    The VE here identified the jobs of addresser, lens inserter,
2    and preparer. (AR 727). The ALJ asked whether the VE's testimony
3    was consistent with the DOT, and the VE declared it consistent.
4    (AR 735, 725). While an ALJ has a duty to obtain a reasonable
5    explanation for apparent conflicts between jobs identified by the
6    VE and the ALJ's stated limitations, see Massachi, 486 F.3d at
7    1152-53; SSR 00-4p, the ALJ need not obtain an explanation if no
8    conflict exists. Cf. Zavalin, 778 F.3d at 846-47 (assessing first
9    whether a conflict exists). Here, no conflict existed. The ALJ
10   did not find that Plaintiff was illiterate and the evidence did
11   not conclusively show illiteracy. (AR 27). The ALJ's finding was
12   supported by substantial evidence. See supra § VII.B.1. The ALJ's
13   proposed hypothetical did not contain the limitation of an
14   inability to read or write because the evidence did not support
15   this limitation. The ALJ therefore was not required to include it
16   in his hypothetical. Rollins v. Massanari, 261 F.3d 853, 857 (9th
17   Cir. 2001) (the ALJ need only include limitations that he found to
18   exist and, because his findings were supported by substantial
19   evidence, did not err in omitting claimant's other claimed
20   limitations).

21

22   Moreover, while Plaintiff's counsel added the limitation of
23   an inability to read to the ALJ's hypothetical (AR 728, 725), the
24   ALJ was not bound to accept this limitation as true. Magallanes
25   v. Bowen, 881 F.2d 747, 756 (9th Cir. 1989) ("The ALJ is not bound
26   to accept as true the restrictions presented in a hypothetical
27   question propounded by a claimant's counsel."); see also Osenbrock,
28   240 F.3d at 1164-65 (ALJ not bound to accept as true the

restrictions set forth in hypothetical if they were not supported
by substantial evidence).

     The ALJ satisfied his duty to inquire into any inconsistencies
between the jobs on which the ALJ relied and the DOT.  The ALJ did
not err at step five.  Accordingly, remand is not required.

### 3.   Any Error Was Harmless

     To the extent the ALJ's step five finding included error,
which this Court finds it did not, any such error was harmless.
See Carmickle, 533 F.3d at 1162 (harmless error rule applies to
review of administrative decisions regarding disability).
Substantial evidence demonstrated that Plaintiff was capable of
working in jobs that required level 1 or 2 reading.  Plaintiff's
past work of bonding circuit boards to pallets at a photography
laboratory, unloading and stocking wood at a warehouse, and loading
and unloading furniture at a warehouse required level 1 or 2
reading, was unskilled and semi-skilled, and required an SVP of 2
or 3.  (AR 726; DOT codes 7.26.687-022, 922.687-058, 929.687.030).
Moreover, substantial evidence supported the ALJ's conclusion that
Plaintiff could communicate in English.  See supra § VII.B.1.  On
this record, if the ALJ had asked the VE to reconcile the
inconsistency, the VE could have relied on substantial evidence in
the record to reconcile the conflict.  Thus, any error committed
by the ALJ was harmless.  Cf. Carmickle, 533 F.3d at 1162 (if ALJ's
error was inconsequential to the ultimate nondisability
determination, no remand is required); see also Burch v. Barnhart,

1 | 400 F.3d 676, 679 (9th Cir. 2005) ("A decision . . . will not be
2 | reversed for errors that are harmless.").

**VIII.**

**CONCLUSION**

Accordingly, IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice.  IT FURTHER IS ORDERED that the Clerk of the Court shall serve copies of this Order and the Judgment on counsel for both parties.

DATED:  September 21, 2016

_____/S/_____
SUZANNE H. SEGAL
UNITED STATES MAGISTRATE JUDGE

**NOTICE**

**THIS MEMORANDUM DECISION IS NOT INTENDED FOR PUBLICATION IN LEXIS, WESTLAW OR ANY OTHER LEGAL DATABASE.**